**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL GOLDSTEIN,** | : | |
| **Plaintiff,** | : | |
| | | **Civil Action No. 3:12-CV-168** |
| **v.** | : | |
| **ELK LIGHTING, INC., ET AL.,** | : | **(JUDGE MANNION)** |
| **Defendants,** | : | |

<u>**MEMORANDUM**</u>

Pending before the court is a Rule 12(b)(6) motion to dismiss filed by defendants Elk Lighting Inc., Mt. Summit Lighting & Accessories Inc., Mark Fludgate, and Bradford Smith. (Doc. No. 10.) The motion seeks dismissal of plaintiff's intentional interference,[1] civil conspiracy, unjust enrichment, and breach of contract claims. (Doc. No. 10.) Defendants also ask the court to strike information in the complaint regarding compromise offers and negotiations. (Doc. No. 10.) For the reasons set forth below, defendant's motion to dismiss is **DENIED**

<u>**BACKGROUND**</u>

In 1993, Mr. Goldstein was hired by Elk Lighting, Inc. pursuant to an

---

[1]The full name of the tort in Pennsylvania is intentional interference with contractual relations or tortious interference with contractual relations. See Rossi v. Schlarbaum, 600 F.Supp.2d 650, 659 (E.D.Pa. 2009) (referring to tort using both names).

employment contract setting forth the terms of his compensation.[2] (Doc. No. 1, at 4.) Elk Lighting is a company that specializes in manufacturing, marketing, and distributing lighting products and accessories to various wholesalers, retailers, department stores, and home improvement companies. (Doc. No. 1, at 4.) At all relevant times, Mr. Fludgate was the majority shareholder and president of Elk, and Mr. Smith was its CEO. (Doc. No. 1, at 3.) Mr. Goldstein was terminated by Elk's board in 1995 but was subsequently rehired in 1997, at which time he negotiated a new contract ("1997 Agreement") with Elk. (Doc. No. 1, at 5.) This contract, along with another one made in 2005, constitutes the heart of the dispute in this case.

The 1997 Agreement contained a "Stock Equivalent Plan" ("SEP"), which gave plaintiff the right to receive a sum of money equal to 10% of the fair market value of the company upon retirement if plaintiff remained with Elk for at least five years.[3] (Doc. No. 1, at 5-6.) The value of the SEP, therefore,

---

[2]Plaintiff calls this agreement the "1993 Agreement." (Doc. No. 1, at 4.) None of plaintiff's claims rely on this contract, however, despite the fact that plaintiff claims he was compelled under duress to waive his rights under it. (Doc. No. 1, at 4.)

[3]The contract provided that the cash payment would be calculated by finding Elk's fair market value. (Doc. No. 1, at 6.) The percentage of the company upon which plaintiff's benefits were computed would increase 2% each year for four years. (Doc. No. 1, at 6.) In the last two years of vesting, the computation would increase by 1%. (Doc. No. 1, at 6.) While the value of the cash payment was determined by reference to the company's value, the contract did not give plaintiff any ownership interest in Elk. ( Doc. No. 1, at 5). The contract further explained that plaintiff would forfeit any accrued cash

depended entirely on the financial success of Elk Lighting Inc. (Doc. No. 1, at 5-6.) The 1997 Agreement also contained a provision granting plaintiff override commissions based on his sales volume. (Doc. No. 1, at 8.) Plaintiff claims he worked for Elk for five years, fulfilled all his obligations under the 1997 Agreement, and by 2002 was fully vested in the plan. (Doc. No. 1, at 8.)

Two years after plaintiff entered into the 1997 Agreement with Elk, Mr. Fludgate formed another company called Mt. Summit Lighting & Accessories, Inc. ("Mt. Summit"). (Doc. No. 1, at 2,9.) Plaintiff provides limited information about Mt. Summit but claims it was Elk's sister company and that it lay dormant for several years after its creation. (Doc. No. 1, at 2,9.)

In 2005 plaintiff signed another employment contract, this time with Elk and Mountain Lake Lighting, a subsidiary of Elk.[4] (Doc. No. 1, at 8.) According to plaintiff, the 2005 Agreement did not contain an integration clause and did not supersede the 1997 Agreement. (Doc. No. 1, at 9.) To the contrary, plaintiff claims the 2005 Agreement references and incorporates several aspects of the former contract, including the SEP. (Doc. No. 1, at 9.)

Around the time plaintiff signed the second contract with Elk, Mr.

---

payment under the plan if he was discharged for cause, committed an act of "willful malfeasance or gross negligence," or voluntarily resigned within 5 years of the commencement of employment. (Doc. No. 1, at 7.)

[4]Plaintiff also claims that Elk and Mountain Lake Lighting is not a separate legal entity from Elk Lighting, Inc. (Doc. No. 1, at 8.)

Fludgate hired Mr. Smith as CEO of Elk and Mt. Summit. (Doc. No. 1, at 9.) According to plaintiff, Mr. Smith began populating Elk with his own hand-selected employees, which created tension between him and plaintiff. (Doc. No. 1, at 9.) Mr. Smith was fully aware of plaintiff's SEP at the time he was hired by Elk, as evidenced by emails between the two parties.[5] (Doc. No. 1, at 10.) Between 2007 and 2010, Mr. Fludgate and Mr. Smith acquired three companies under the Elk corporate umbrella. (Doc. No. 1, at 13.) Starting in 2011, at the time plaintiff began asking about his SEP benefits, Mr. Fludgate and Mr. Smith acquired three companies using Mt. Summit rather than Elk.[6] (Doc. No. 1, at 13.) Plaintiff claims these acquisitions were diverted away from Elk to Mt. Summit in an attempt to diminish the value of his SEP. (Doc. No. 1, at 14.)

In 2010 plaintiff began discussing a retirement date with Mr. Smith and Mr. Fludgate. (Doc. No. 1, at 10.) He claims that Mr. Smith and Mr. Fludgate began hatching a plan at that time to deprive him of the money owed to him under the SEP. (Doc. No. 1, at 10.) In pursuit of these ends, Mr. Smith and Mr. Fludgate offered plaintiff an agreement that would discharge plaintiff's

---

[5]According to plaintiff, the email, which carbon copied Mr. Fludgate, acknowledged plaintiff's SEP benefits. (Doc. No. 1, at 10.)

[6]The complaint does not say whether these were the only acquisitions made during the time period, nor does it foreclose the possibility that Elk also made some acquisitions during this time.

4

rights under the prior agreements in exchange for a cash buyout. (Doc. No. 1, at 11.) Plaintiff claims he exchanged several emails with defendants exploring the possibility but never reached an agreement. (Doc. No. 1, at 11.) In fall 2011, several months before his retirement, he again approached Mr. Fludgate about his rights under the SEP, but plaintiff does not indicate whether anything came of the discussion. (Doc. No. 1, at 11.) Plaintiff retired on December 31, 2011 and, having received no confirmation that Elk would honor its commitments under the contracts, sent a letter to Mr. Fludgate in January 9, 2012.[7] (Doc. No. 1, at 12.) The letter asked whether Elk intended to pay plaintiff his SEP benefits and requested documents and financial records needed to compare the value of the SEP with defendants' cash buyout offer. (Doc. No. 1, at 12.) In response, Mr. Smith sent plaintiff a letter confirming that the discussions regarding the buyout were simply an offer and that the offer was rescinded. (Doc. No. 1, at 12.)

## STANDARD OF REVIEW

Defendant's motion to dismiss is brought pursuant to the provisions of Fed. R. Civ. P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has

---

[7]Plaintiff had his attorney send the letter. (Doc. No. 1, at 12.)

been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 127 S. Ct. at 1965. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. Id. Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263 (3d Cir.2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached]

documents." [Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993)](). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." [Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.2002)](). However, the court may not rely on other parts of the record in determining a motion to dismiss. See [Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994)]().

## DISCUSSION

### A. INTENTIONAL INTERFERENCE AND CIVIL CONSPIRACY

Defendants first move to dismiss plaintiff's intentional interference and conspiracy claims, arguing that they are barred by Pennsylvania's gist of the action doctrine. Next, they make various arguments that a corporation's agents cannot conspire or interfere with the contracts of their employer. Finally, because they argue the interference claim should be dismissed, they point out that the conspiracy claim no longer contains an underlying cause of action about which defendants conspired. Because several of these arguments are contingent and related to both the conspiracy and intentional interference claims, the court will consider them together. In light of the following, defendants' motion to dismiss the intentional interference and civil

7

conspiracy claims is **DENIED**.

### I.) The Gist of the Action Doctrine

Defendants argue that the "gist of the action doctrine" bars plaintiff from asserting tort claims in this case because the true nature of the dispute is contractual. (Doc. No. 11, at 14, 15.) They claim that plaintiff's intentional interference and conspiracy claims are simply contract claims masquerading as tort claims and point to the similar wording of the various claims as proof. (Doc. No. 1, at 15.) According to defendants, plaintiff's tort claims are "inextricably intertwined with the purported contractual obligations." (Doc. No. 1, at 17.)

The gist of the action doctrine seeks to maintain a distinction between the boundaries of tort and contract law by requiring courts to look beyond the face of the pleadings and determine whether an alleged tort claim actually sounds in contract. Sarsfield v. Citimortgage, 707 F.Supp.2d 546, 553 (M.D. Pa. 2010) (quoting eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002)); Pennsylvania Mfrs. Ass'n Ins. Co. v. L.B. Smith, Inc., 831 A.2d 1178, 1182 (Pa. Super. Ct. 2003) (explaining that courts must examine the claim to determine its true gist). Tort claims "lie for breaches of duties imposed by law as a matter of public policy, whereas contract actions lie only for breaches of duties imposed by consensual agreements between

8

particular individuals." Id. To determine when a contract claim is really masquerading as a tort, the court must determine whether the "parties' obligations are defined by the terms of the contract [or] by the larger social policies embodied by the law of torts." Id. (quoting Hart v. Arnold, 8844 A.2d 316, 339-40 (Pa. Super. Ct. 2005)). On the other hand, if the contract is merely "collateral" to a claim, the gist of the action doctrine does not bar the tort claim. (Hart v. Arnold, 884 A.2d 316, 339 (Pa. Super. Ct. 2005) ("a breach of contract may give rise to an actionable tort where the wrong ascribed to the defendant is the gist of the action, the contract being collateral.")). Pennsylvania courts have enumerated four scenarios where the gist of the action doctrine precludes recover in tort:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim. Sarsfield v. Citimortgage, Inc., 707 F.Supp.2d 546, 553 (M.D.Pa 2010) (citing eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2010).

Defendants argue that plaintiff's intentional interference and civil conspiracy claims boil down to contractual disputes and should be treated as such. (Doc. No. 11, at 15.) To better understand whether these claims sound in contract, however, the court must examine their respective elements. The elements of conspiracy are, "1) A combination of two or more persons acting

with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; 2) an overt act done in pursuance of the common purpose; and 3) actual legal damage." Goldstein v. Phillip Morris, Inc., 854 A.2d 585, 590 (Pa. Super. Ct. 2004). To prove intentional interference with contractual relations under Pennsylvania law, a plaintiff must show:

> (1) the existence of a contractual, or prospective contractual relation between the plaintiff and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; [and] (4) the occasioning of actual legal damage as a result of the defendants' conduct.[8] Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998) (citing Pelagatti v. Cohen, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1987)).

A cursory review of the elements required to establish an intentional interference claim shows that the existence of a contract must be, by definition, at the heart of every intentional interference claim. (Id. (requiring existence of a contract)). Nevertheless, defendants argue that the gist of the action doctrine should bar the claim because both the tort claims "are inextricably tied to the purported obligations contained within the 1997 and/or

---

[8]The court included one more element that pertains only to prospective contracts. (Brokerage Concepts v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998) ("for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference. . ."). Because plaintiff claims defendants interfered with a preexisting contract, (Doc. No. 1, at 16), this element is irrelevant here.

2005 Agreements." (Doc. No. 17, at 3.) In other words, defendants suggest that a party cannot assert an intentional interference claim if it is predicated on an underlying contract, even if it is filed against someone who was not a party to the contract in question. This would effectively preclude all intentional interference claims and presents a logical problem akin to a catch-22: a party must allege a contract in order to raise an intentional interference claim, but a party cannot claim there was a contract because the gist of the action doctrine would then bar the tort. The gist of the action doctrine does not purport to venture so destructively into the realm of torts. See eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002) ([I]t is possible that a breach of contract also gives rise to an actionable tort.").

Moreover, the purpose behind the gist doctrine shows that plaintiff is not recasting a breach of contract claim as a tort. Contractual disputes arise out of duties created in a mutual agreement. eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (quoting Bash v. Bell Tel. Co., 601 A.2d 825, at 829 (Pa. 1992) (superseded on other grounds)). As such, "a claim should be limited to a contract claim when the 'parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts." Id.; see also ACME-Hardesty Co. v. Wenger, 2003 WL 1847461, at *4 (C.C.P. 2003) (dismissing negligence claim against the other party to the contract); Advantage Systems, Inc. v.

Bentley Systems, Inc., 2006 W.L. 2687140, at \*2 (C.C.P. 2006) (dismissing tort claim under gist doctrine because duties arose from parties' contract). Plaintiff alleges that the 1997 and 2005 contracts were only made between him and Elk Lighting Co., (Doc. No. 1, at 14), while his intentional interference claim is asserted against Mr. Smith, Mr. Fludgate, and Mt. Summit. (Doc. No. 1, at 16.) None of the defendants named in the intentional interference allegations were parties to any of the contracts at issue in this case.[9] Therefore, the parties' obligations were not and could not be defined by the terms of any contract. Rather they were governed "by the larger social policies embodied by the law of torts." eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (quoting Bash v. Bell Tel. Co., 601 A.2d 825, at 829 (Pa. 1992) (superseded on other grounds)). As such, the 1997 and 2005 contracts are properly viewed as "collateral" to plaintiff's tort claim, and the conspiracy and interference claims are not precluded by the gist of the action doctrine.

### II.) Defendants Cannot Interfere With Their Own Contract

Defendants next seek dismissal of the intentional interference claim by claiming that Mr. Smith and Mr. Fludgate were corporate officers, so any

---

[9]The contracts were executed by Mr. Fludgate on behalf of Elk Lighting Co., and plaintiff claims the contract was only between plaintiff and company. (Doc. No. 1, at 5, 8.) The court must accept these allegations as true.

conduct on their part that interfered with corporate contracts was privileged. (Doc. No. 11, at 18.) They argue that, as agents of the corporation, they were the same legal entity as the corporation, so plaintiff has not established third-party interference.

In order to plead an intentional interference claim, the plaintiff must identify three parties – two contracting parties and an interfering party. Reading Radio, Inc. v. Fink, 833 A.2d 199, at 210 (Pa. Super. Ct. 2003) (setting for elements of intentional interference claim). Corporate officers are immune from interfering with corporate contracts when acting in their official capacities because the officers and the corporation are essentially the same legal entity. Wagner v. Tuscarora School Dist., 04–CIV–1133, 2006 WL 167731, \*12 (M.D.Pa. 2006) (citing Nix v. Temple University, 596 A.2d 1132, 1137 (Pa. Super. Ct. 1991)). Of course corporate officers do not enjoy immunity when acting in a personal capacity, when the "officer's sole motive in causing the corporation to breach the contract is actual malice toward the plaintiff," or when "the officer's conduct is against the corporation's interest."[10]

---

[10]Defendants cite General Refractories Co. v. Fireman's Fund Ins. Co. for the proposition that "the fact that an agent may have acted in bad faith or with the illegitimate purpose of abusing process in mind, does not, in itself, bring the agents actions outside the scope of the relationship." Doc. No. 17, at 6 (citing General Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297 (3d Cir. 2003)). That case addressed allegations of civil conspiracy among an attorney, his law firm, and an insurance company. (Id. at 302-03.) In finding that the attorney did not act outside the scope of representation and was therefore immune, the court applied a more rigorous standard governing the

Id. (noting actual malice and corporate interest exceptions); Kia v. Imaging Sciences Intern., Inc., 735 F.Supp.2d 256, 268 (E.D.Pa 2010) (quoting American Trade Partners, L.P. v. A-1 Intern. Importing Enterprises, Ltd., 757 F.Supp. 545, 555-556 (E.D.Pa. 1991) (noting that officer is not immune when acting in personal capacity).

In the complaint, plaintiff alleges that Mr. Smith and Mr. Fludgate acted "with an intent to avoid and/or reduce obligations of Elk and for the benefit of themselves" and "for their own benefit, devised a plan to wrongfully deprive [plaintiff] of his interest in Elk." (Doc. No. 1, at 16.) Plaintiff also claims Mr. Fludgate was an Elk shareholder, (Doc. No. 1, at 3), which, when viewing the complaint as a whole, allows the court to infer from plaintiff's allegations that

---

scope of employment when compared to corporate officers. The court said:

> Ultimately, we concluded that, because defendants acted within the attorney-client relationship, they cannot be considered conspirators. In reaching this conclusion, we emphasized that the policy reasons for applying the intracorporate conspiracy ban **are even more compelling in the attorney-client context than in the corporate field**, given that counsel's conduct within the scope of representation is regulated and enforced by disciplinary bodies established by the courts. (Id. at 313 (citations and quotations omitted) (emphasis added).

Therefore, the court in *General Refractories* created a different standard for applying immunity. Defendants also cite Brumfield v. Sanders, but that case involved federal employee immunity from state tort claims. Brumfield v. Sanders, 232 F.3d 376, at 379 (3d Cir. 2000). Defendants have not demonstrated why that case applies here when other cases cited above are directly on point.

Mr. Fludgate was acting as a shareholder, not a corporate officer when he used Mt. Summit, not Elk, to make acquisitions. He also claims Mr. Smith and Mr. Fludgate were CEO and president of Mt. Summit and that they made these acquisitions as officers of Mt. Summit. (Doc. No. 1, at 3, 11.) Not only does this indicate defendants acted in their own interest, it demonstrates that they acted as agents of Mt. Summit and not within the scope of their agency with Elk.

### III.) Defendants' Conspiracy Amongst Themselves

To frame a civil conspiracy case under Pennsylvania law, a party must allege, "1) A combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; 2) an overt act done in pursuance of the common purpose; and 3) actual legal damage." Goldstein v. Phillip Morris, Inc., 854 A.2d 585, 590 (Pa. Super. Ct. 2004). Defendants claim that Mr. Smith and Mr. Fludgate, as agents of Elk, could not conspire amongst themselves, (Doc. No. 11, at 24), because they are considered one and the same legal entity for civil conspiracy purposes. (Doc. No. 11, at 23.)

Defendants correctly assert that, under the intracorporate conspiracy doctrine, officers of an entity ordinarily cannot conspire amongst themselves or with the entity, at least "when they act solely for the corporation." Tyler v.

O'Neill, 994 F.Supp. 603, 613 (E.D.Pa. 1998), aff'd, 189 F.3d 465 (3d Cir. 1999). This rule contains exceptions, including when corporate "agents or employees act outside of their corporate roles." Id.; Reeser v. NGK Metals Corp., 247 F.Supp.2d 626, 630-31 (E.D.Pa. 2003).

As explored above, plaintiff has sufficiently alleged that defendants Fludgate and Smith acted outside the scope of their agency relationship with Elk. These allegations allow the court to infer that defendants were acting in their individual capacities and are not protected by the intracorporate conspiracy doctrine.

### IV.) Underlying Cause of Action for Conspiracy Claim

Defendants claim that plaintiff has not properly pleaded a conspiracy claim because he has not identified an underlying cause of action under which plaintiff could sue in the first place. (Doc. No. 11, at 14.) As stated above, civil conspiracy requires, "1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; 2) an overt act done in pursuance of the common purpose; and 3) actual legal damage. Goldstein v. Phillip Morris, Inc., 854 A.2d 585, 590 (Pa. Super. Ct. 2004). Furthermore, "absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." Id.

Defendants claim plaintiff has not alleged any illegal course of action in pursuit of which defendants were conspiring. (Doc. No. 11, 21-23.) They rely on their arguments concerning plaintiff's intentional interference claim and argue that, because the interference claim fails, the civil conspiracy claim fails as well. (Doc. No. 11, at 23.) Because the court finds that plaintiff has adequately stated a claim for intentional interference, defendants argument is moot.

## B.    UNJUST ENRICHMENT

Defendants next move to dismiss plaintiff's unjust enrichment claim on the grounds that unjust enrichment is only an appropriate remedy when no express contract exists. (Doc. No. 11, at 25.) Unjust enrichment is an equitable remedy under Pennsylvania law that allows a court to imply a contract where none exists and require the offending party to pay the benefit of any value received. Com. v. TAP Pharmaceutical Products, Inc., 36 A.3d 1197, 1264 (Pa. Commw. Ct. 2011). It is a "quasi-contractual" remedy and is unavailable when "the relationship between parties is founded on a written agreement or express contract." Braun v. Wal-Mart Stores, Inc., 24 A.3d 875, 896 (Pa. Super. Ct. 2011). Thus, unjust enrichment and breach of contract are mutually exclusive remedies.

The polarity between unjust enrichment and breach of contract presents

a unique problem in the context of a motion to dismiss because the Federal Rules of Civil Procedure allow for pleading in the alternative. 18KT.TV, LLC v. Entest Biomedical, Inc., 2011 WL 5374515 (M.D. Pa. 2011). In *Entest*, like the case at hand, the plaintiff raised unjust enrichment and breach of contract claims stemming from same course of dealing between the parties. Id. at *6. The defendants sought dismissal under Rule 12(b)(6), arguing the plaintiff was precluded from claiming unjust enrichment damages because he had simultaneously alleged there to be an express contract. Id. The court noted that the federal rules allow parties to plead in the alternative, even if the theories underlying two claims are inconsistent. Id. (citing Fed. R. Civ. P. 8(d)). The court rejected any argument that the alleged written contract precluded plaintiff from raising an unjust enrichment claim, stating, "defendants argue that plaintiff has lost the ability to plead unjust enrichment in the alternative because plaintiff has also proffered a purportedly valid express contract; however, such pleadings are not inconsistent until the plaintiff has established the contract as valid and governing the dispute." Id.

While Pennsylvania substantive law may limit recovery to one of the two, unjust enrichment or breach of contract, federal pleading standards allow litigants to allege both claims in the complaint. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency"); ASD Specialty Healthcare Inc. v. New Life Home Care Inc.,

[2011 WL 5984024, \*5 (M.D.Pa. 2011)](#). While plaintiff has ostensibly demonstrated that there was a contract between the parties by pleading it, nothing prevents defendants from later moving for summary judgment on the breach of contract claim, thereby leaving plaintiff without an alternative theory of recovery. The record shows no stipulation between the parties conceding that a contract existed which governed the relevant aspects of the case at hand. Therefore, it is incorrect to say that there is no "dispute as to the existence of an express contract . . ." (Doc. No. [11](#), at 25.) While none may appear on the face of the complaint, discovery may reveal a doubt as to its existence. As such, defendant's motion to dismiss the unjust enrichment claim is **DENIED**.

## C.    BREACH OF CONTRACT

Defendants next argue that Count I of the complaint should be dismissed because it "purports to set forth a cause of action for breach of contract against Elk, but . . . is truly a count for breach of the implied covenant of good faith and fair dealing." (Doc. No. [11](#), at 26.) Defendants comment that Pennsylvania law does not recognize a claim for breach of good faith and fair dealing as an independent cause of action. (Doc. No. [11](#), at 26.) Rather, they point out, such a claim is part and parcel to a breach of contract claim, a claim they contend plaintiff did not adequately state. (Doc. No. [11](#), at 26.)

In pleading a breach of contract claim, a party must allege "(1) the existence of a contract including essential terms, (2) breach of a duty imposed by the contract, and (3) resultant damages" to survive a motion to dismiss. Vartan v. Wells Fargo Bank Northwest, N.A., 2012 WL 1339904 (M.D.Pa 2012). In determining whether these requirements have been met, "the district court must consider a complaint in its entirety without isolating each allegation for individualized review." In re Pressure Sensitive Labelstock Antitrust Litig., 566 F.Supp.2d 363 (M.D.Pa. 2009) (citing Bell Atlantic Corp., v. Twombly, 550 U.S. 544, 569 (2007)). Finally, while Pennsylvania law "does not allow for a separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract. . . every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." Com. v. BASF Corp., 2001 WL 1807788, at *12 (C.C.P. 2012) (citing Creeger Brick and Bldg. Supply Inc. v. Mid-State Bank and Trust Co., 560 A.2d 151, 153-54 (Pa. Super. Ct. 1989)); JHE, Inc. v. Southeastern Pennsylvania Transp. Authority, 2002 WL 1018941, at *6 (C.C.P. 2002) (finding that covenant "merely guides the construction of the explicit terms in the agreement" under Pennsylvania law).

Defendants point to several cases which they claim prove that Count I should be dismissed. (Doc. No. 11, at 26.) In all these cases, however, the parties pleaded implied covenant claims as independent causes of action.

Com. v. BASF Corp., 2001 WL 1807788, at \*12 (C.C.P. 2001) (pleading independent claims for breach of contract and breach of implied covenant); McHale v. NuEnergy, 2002 WL 321797, at \*8 (E.D.Pa. 2002) (pleading both claims, but breach of contract claim was dismissed); JHE, Inc. v. SEPTA, 2002 WL 1018941, at \*6 (C.C.P. 2001) (pleading breach of implied warranty in separate count). These cases are distinguishable because plaintiff in the present case is not making an distinct claim for breach of an implied covenant; this much should be abundantly clear from the face of the complaint. Count I is titled "Count I Breach of Contract," (Doc. No. 1, at 14), and paragraph 60 states:

> In creating and utilizing Mt. Summit as an acquisition tool to acquire the companies set forth above, instead of Elk, Elk and its officers have **breached the implied covenant of good faith and fair dealing in the 1997 Agreement and 2005 Agreement**, by attempting to diminish the value of Mr. Goldstein's right to payments equivalent to 10% of the value of Elk as obligated by the 1997 Agreement and as reaffirmed in the 2005 Agreement. (Doc. No. 1, at 15 (emphasis added)).

Contrary to defendants' interpretation, plaintiff's complaint does not plead a breach of implied covenant as a separate cause of action. Rather, he pleads breach of the implied covenant contained within the 1997 and 2005 contracts. As previously noted, to plead a breach of contract, plaintiff must identify "a breach of a duty imposed by the contract." Vartan v. Wells Fargo Bank Northwest, N.A., 2012 WL 1339904 (M.D.Pa. 2012). Plaintiff does that, in part, by identifying the implied covenant of good faith and fair dealing and

alleging that it was breached when defendants allegedly funneled lucrative business deals to a sister company to diminish the value of plaintiff's contract. As such, plaintiff properly characterizes his dispute as a breach of contract, only addressing the implied covenant to specifically allege which particular duties were violated. Therefore, defendants motion to dismiss count I of the complaint as an improper breach of implied covenant claim is **DENIED**.

## D. Motion to Strike References to Compromise Offers and Negotiations

Defendants last request is that the court strike information in the complaint that refers to compromise offers and negotiations between the parties. (Doc. No. 11, at 27-28.) In particular, defendants point to allegations of negotiations among Mr. Fludgate, Mr. Smith, and plaintiff concerning a cash payment and other benefits to be paid in lieu of plaintiff's entitlement to 10% of the company's value.[11] (Doc. No. 11, at 28.) Plaintiff counters, explaining that this information is offered to establish "a timeline" or lay a foundation, not to "establish liability, or the validity or amount of the claim." (Doc. No. 14, at 28.) For the reasons stated below, the court will **DENY** defendants motion to strike.

---

[11]Defendants state that the inadmissible information is in paragraphs 37 and 42. After reviewing the complaint, the court found no information about settlement or compromise in paragraph 42. Plaintiff refers to these matters in paragraphs 37, 38 and 43. (Doc. No. 1, at 11-12.) This memorandum addresses all references to settlements or compromises, no matter where they appear in the complaint.

At the outset, it should be noted that Rule 408 is a rule of evidence and does not govern pleadings. Steak Umm Co., LLC v. Steak Em Up, Inc., 2009 WL 3540786, at * 3 (E.D.Pa. 2009); but see Providence Town Center LP v. Raymours Furniture Co., Inc., 09-CV-3902, 2009 WL 3821935 (E.D.Pa. 2009) (explaining that some judges "have granted motions to strike references to settlement negotiations that they found to be inadmissible under Rule 408 and thus immaterial.") The difference between Rule 12(f) and Rule 408 becomes clear when their standards are compared. Rule 12(f) allows the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule 408 states that evidence of compromise offers and negotiations is not admissible to "prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a). Defendants' argue:

> Because compromises and offers of compromises are not admissible to prove liability for or invalidity of a claim or its amount under Rule 408 of the Federal Rules of Evidence, portions of the complaint and any portions of exhibits thereto which reference such offers should be stricken as immaterial and impertinent. (Doc. No. 11, at 27 (emphasis added)).

The court realizes that Rule 408 prohibits evidence of settlement negotiations under some circumstances, even if the evidence is relevant. While rule 12(f) gives courts "considerable discretion in disposing of a motion to strike, . . . striking information from the pleadings is a "drastic remedy to be resorted to only when required for the purposes of justice" and should be

used "sparingly." Scottie v. USAA Casualty Insurance Co., No. 3:10 CV 1538, 2011 WL 616008, at *2 (M.D.Pa. Feb. 11, 2011) (quoting DeLa Cruz v. Piccari Press, 521 F.Supp.2d 424, 428 (E.D.Pa. 2007)). At this stage in the proceedings and using the appropriate standard governing Rule 12(f), the court does not find the information redundant, immaterial, impertinent, or scandalous. Plaintiff explains that information about the purported negotiations is pertinent as background information to establish "the relevant timeline of conspiratorial conduct of Defendants." (Doc. No. 14, at 29.) Should defendants remain firm in their conviction that Rule 408 prohibits this evidence, they may file a motion in limine before trial.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

DATE: March 4, 2013